IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JOSEPHINE WADE SMITH and RUPERT SMITH, | ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) ) |
| CSX TRANSPORTATION, INC., | ) ) |
| Defendant. | ) |

No. 14 CV 5704

Judge Ellis

Magistrate Judge Gilbert

**CSX TRANSPORTATION, INC.'S MEMORANDUM
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Defendant, CSX Transportation, Inc. ("CSXT"), by its attorneys, Sean Sullivan and Kathryn Doi of Daley Mohan Groble, P.C., pursuant to Rule 56, hereby submits its memorandum in support of its motion for summary judgment on all claims brought by Plaintiffs Josephine Wade Smith and Rupert Smith in their Complaint.

**INTRODUCTION**

Plaintiffs bring the present action against CSXT, alleging that they suffered property damage and personal injury as a result of long-term exposure to locomotives idling on railroad tracks adjacent to their property. Plaintiffs claim that CSXT regularly caused its locomotives to park adjacent to Plaintiffs' property with the locomotive engines running for hours-long and often overnight time periods, resulting in "vibrations causing seismic damage to Plaintiffs' property and exposure to engine exhaust fumes." (Complaint, Doc. #1-1, ¶ 1). Plaintiffs further allege that one of CSXT's locomotives derailed adjacent to Plaintiffs' property on September 2, 2012, generating impact forces which caused "even greater" damage to the subject property. (Id., ¶ 2).

Plaintiffs' Complaint alleges two claims against CSXT under Illinois law: 1) negligence; and 2) intentional conduct – property damage. Plaintiffs allege that CSXT was negligent with regard to the manner in which it operated its trains, where CSXT knew or should have known those idling trains would cause damage due to the "long-term vibrations" of the ground behind Plaintiffs' residence. Plaintiffs further allege that the idling of the locomotives "constitutes a nuisance and a vibration trespass, and demonstrates willful and purposeful conduct in flagrant disregard for adjacent homes and their residents." (Id. ¶ 17). Plaintiffs also allege unspecified damages from diesel fumes emanating from the trains.

Summary judgment in favor of CSXT is warranted on both the negligence and intentional conduct claims for all damage allegedly arising from CSXT's decision to park idling locomotives, which falls squarely within the parameters of operational decisions concerning transportation by rail, and therefore is preempted by the Interstate Commerce Commission Termination Act of 1995, 49 U.S.C. §§ 10101, *et seq*. (the "ICCTA"). The ICCTA preempts all forms of state regulation over rail operations, including common law damage actions, that would restrict or burden a rail carrier's operations.

Summary judgment is also warranted on any claim purporting to arise from the September 2, 2012 derailment. Plaintiffs have developed no evidence in support of their claims of damage and, on the contrary, reported the same damage to their property that they claim occurred as a result of the September 2012 derailment <u>over a year prior</u> to the time of the derailment. Undisputed facts also demonstrate that the point of impact was three-quarters of a mile away from Plaintiffs' residence; that no cars left the track anywhere near Plaintiffs' residence; and that no other homeowners in the vicinity of the impact site reported any damage whatsoever to CSXT as a result of the derailment. All of the evidence directly contradicts Plaintiffs' claim that the derailment proximately caused their alleged damages.

## SUMMARY OF UNDISPUTED FACTS

### *Plaintiffs' Residence*

Plaintiffs, Josephine Wade Smith and Rupert Smith, have lived in the residence at 8563 South Rockwell Street, Chicago, Illinois, since 1987. (Rule 56.1 Statement of Facts ("SOF") at ¶ 6) The residence was built in 1979. (Id. at ¶ 6). Plaintiffs allege that freight trains operated by CSXT regularly park behind their home with the locomotive engines running, for hours at a time. (Id. at ¶ 53). CSXT owns the tracks that run behind Plaintiffs' home, upon which multiple railroads operate freight trains. (Id. at ¶¶ 12-13).

### *Rail Operations on the Subject Tracks*

Chicago is the largest freight railroad hub in the world, with more freight moving through the Chicago area by rail than anywhere else in the world. (Id. at ¶ 10). Several major railroads, including CSXT, Norfolk Southern, BNSF, Union Pacific, Canadian National, Canadian Pacific, Indiana Harbor Belt and the Belt Railway of Chicago, operate trains through the City of Chicago. (Id. at ¶ 11). CSXT's two north/south tracks adjacent to Plaintiffs' residence intersect with three east/west tracks north of Plaintiffs' residence, at 75th Street. (Id. at ¶ 17). Metra commuter trains and freight trains from other railroads also regularly operate on the east/west tracks through the 75th Street interchange. (Id. at ¶ 19). There are additional interchanges at Brighton Park and Ash Street which CSXT does not control, and for which it must get permission to cross. (Id. at ¶ 22). The various railroads operating on these tracks must obtain permission from the railroad operating the interchanges in order to cross over that railroad's tracks, and there is an agreed protocol among the railroads that Metra trains have priority over all other train traffic within the rail network in Chicago. (Id. at ¶¶ 20-22).

*Parking Trains and Idling Locomotives*

At times, CSXT has to park its trains on the tracks behind Plaintiffs' residence due to a number of circumstances and based upon operational necessity. (Id. at ¶¶ 14-16, 18, 28). CSXT often must park trains while waiting for permission to pass through the interchange at 75th Street, as well as while waiting their turn to cross the Brighton Park and Ash Street interchanges. (Id. at ¶¶ 18, 22-23). The train traffic along the tracks through the interchanges varies by day, and there is also unscheduled traffic that goes through these interchange areas. (Id. at ¶ 24). Trains passing through these interchanges can potentially wait for hours to cross through due to the amount of traffic on the tracks on any given day. (Id. at ¶ 25). There are various constraints relating to trains and track that CSXT must consider in determining the time and place where a particular train can be parked, including the length of the train, its final destination, and any additional rail traffic using the same tracks. (Id. at ¶¶ 29-31).

With regard to the idling of train engines, the determination to park or idle a train in a location at a given time is a railroad operational decision, which is based on operational necessity. (Id. at ¶¶ 15-16). No government regulation exists which limits how long a train can be parked or idled. (Id. at ¶ 34). CSXT's policy is that diesel engines on locomotives must be kept running when the temperature is below 40 degrees Farenheit, in order to avoid freeze-ups or damage to the engine. (Id. at ¶ 36). Additionally, if the locomotive engine is shut down, the train will lose air pressure to its braking system, which would require the railroad to conduct a Class I air test under the Federal Railroad Administration ("FRA") regulations before the train can be operated again. (Id. at ¶¶ 37-38). Class I air tests can take hours to complete, and therefore, CSXT generally keeps its locomotives running when the trains are parked. (Id. at ¶¶ 38-39).

4

*Damages Claimed Prior to the Derailment*

On May 12, 2011, Mrs. Smith reported to CSXT complaints of damage to her home as well as physical ailments from trains idling outside her home. (Id. at ¶ 54). Mrs. Smith contacted CSXT by telephone in June of 2011, claiming that she had sustained damage as a result of trains operating on the track adjacent to her residence, including that: 1) the foundation was cracked; 2) the home flooded due to cracked foundation; 3) mold was present; 4) living room walls were cracked and separating; 5) dishes in china cabinet were cracked; 6) driveway had severe cracks and was not level; 7) her car rattled and vibrated due to uneven surface; and 8) she and her husband were having health issues. (Id. at ¶¶ 55-57). Mrs. Smith also filled out a CSXT form, stating that as of December of 2009, the idling trains caused the following damages to her home: shattered windows, broken chandelier, broken foundation, structural damage to basement which caused it to flood, cracks in ceiling, broken dining room cabinet and contents. (Id. at ¶¶ 58-59). She also noted that she was having health issues as of December of 2009 as a result of idling trains, including an inability to sleep, which she claims led her to suffer nerve damage, depression and hospitalization. (Id. at ¶ 60).

On May 26, 2012, Mrs. Smith wrote again to CSXT, stating that her home had been damaged as a result of idling trains, including damage to the foundation, windows, antiques, lighting fixtures and dinnerware. (Id. at ¶ 61). At that time, she submitted $6,000.00 in itemized damage to personal property, including antiques, china, lighting fixtures and furniture; $22,464.45 in alleged composite medical expenses for the years 2009, 2011 and 2012; and $97,396.00 in contract proposals for repair to the alleged damage to the foundation, windows, floors, basement foundation and cracks in the interior walls of her residence. (Id. at ¶¶ 62-64, 65-67).

*The Derailment*

At approximately 2:43 a.m. on September 2, 2012, CSXT train Q19201 rear-ended another CSXT train that was stopped at the 75th Street interchange. (Id. at ¶ 40). Both trains were operating on the easternmost of the CSXT tracks that run adjacent to Plaintiffs' residence. (Id. at ¶ 40). The impact of the collision was north of 83rd Street, approximately three-quarters of a mile from the Plaintiffs' residence. (Id. at ¶ 41). As a result of the low-speed collision, which resulted in no injuries, several cars of train Q19201 derailed, and several intermodal containers rolled off those cars and landed approximately fifty feet from the home located adjacent to the track and on the north side of 83rd Street. (Id. at ¶¶ 42-45). No train cars derailed south of 83rd Street. (Id. at ¶ 46). CSXT sent a locomotive to retrieve the railcars that remained on the tracks south of 83rd Street, and those railcars were pulled away without any issues. (Id. at ¶ 47).

CSXT did not receive any claims of property damage from residents living near the site of the impact or derailment. (Id. at ¶ 48). The only claim of property damage that CSXT received from any resident in the area was from the 83rd Street homeowner for damage to his yard from heavy equipment that CSXT used to remove the intermodal containers from his yard. (Id. at ¶ 49). The 83rd Street homeowner did not report any damage to the interior of his home, his basement or foundation as a result of the removal of the containers, and no changes to the foundation were observed upon inspection. (Id. at ¶¶ 50-52).

After the derailment on September 2, 2012, Mrs. Smith submitted proposals from her contractors for repairs to their residence, including a $47,000.00 proposal from DeGraf Concrete Construction, a $42,146.00 proposal from A-Dynamic Flooring Concepts/ Interior Professionals, and a $8,250.00 proposal from U.S. Waterproofing. (Id. at ¶¶ 69-71). These proposals were for the exact same amounts and repairs, and from the same contractors, as those that Mrs. Smith had submitted prior to the derailment. (Id. at ¶¶ 65-67, 69-71).

6

**ARGUMENT**

Summary judgment must be entered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material "only if it might affect the outcome of the case under the governing law." Anweiler v. American Elec. Power Serv. Corp., 3 F.3d 986, 990 (7th Cir. 1993). Although the moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact, there is no requirement that the movant negate his opponent's claim. Celotex Corp. v. Carrett, 477 U.S. 317, 323 (1986). Once the moving party has met its initial burden, the nonmovant may not rest on conclusory allegations but instead must come forward with evidence demonstrating the existence of each element of its case upon which it would bear the burden of proof at trial. Fed. R. Civ. P. 56(e); Matney v. County of Kenosha, 86 F.3d 692, 695 (7th Cir. 1996).

To avoid summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsuhita Elec. Indus. Co., Ltd.v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); McGinn v. Burlington N. R.R. Co., 102 F.3d 295, 298 (7th Cir. 1996). Evidence which is merely colorable or not significantly probative cannot defeat summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).

**I.** **THE ICCTA PREEMPTS ALL OF PLAINTIFFS' CLAIMS IN COUNTS I AND II OF THE COMPLAINT WITH REGARD TO IDLING TRAINS**

Railroads are subject to the regulatory authority of Congress under the Commerce Clause. *See*, *e.g.*, Pittsburgh & Lake Erie R.R. Co. v. Ry Labor Execs. Ass'n, 491 U.S. 490, 510 (1989). Congress initially asserted federal authority over the railroad industry by enacting the Interstate Commerce Act, ch. 104, 24 Stat. 379 (1887), acknowledged as "among the most pervasive and comprehensive of federal regulatory schemes." City of Auburn v. United States,

7

154 F.3d 1025, 1029 (9th Cir. 1998). Federal regulation of the industry expanded even further in 1995 when Congress enacted the ICCTA – a statute that included an express preemption of state "regulation of rail transportation." With its enactment of the ICCTA, Congress intended to "significantly reduce state and local regulation of railroads." Maynard v. CSX Transp., Inc., 360 F. Supp. 2d 836, 839 (E.D. Ky. 2004); *see also* Friberg v. Kansas City S. Ry. Co., 267 F.3d 439, 443 (5th Cir. 2001) (" [T]he plain language of the statute itself, and in particular its preemption provision, is so certain and unambiguous as to preclude any need to look beyond that language for congressional intent"); CSX Transp., Inc. v. Ga. Pub. Serv. Comm'n, 944 F. Supp. 1573, 1581 (N.D. Ga. 1996) ("It is difficult to imagine a broader statement of Congress's intent to preempt state regulatory authority over railroad operations").

Through the ICCTA, Congress established the Surface Transportation Board ("STB") as an agency within the United States Department of Transportation with authority to regulate all aspects of railroad operations. *See* 49 U.S.C. §§ 701(a), 702. ICCTA Section 10501 reserves for the STB, and only the STB, jurisdiction over:

> (1) *transportation by rail carriers*, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, *and other operating rules*), *practices, routes, services, and facilities of such carriers*; and
>
> (2) the construction, acquisition, *operation*, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State, . . . (emphasis added).

49 U.S.C. § 10501(b). Section 10102(9) of the ICCTA defines rail transportation expansively to encompass any locomotive, property, facility, structure, or equipment "related to the movement of passengers or property, or both, by rail, regardless of ownership or an agreement concerning use." 49 U.S.C. § 10102(9); *see also* Cedarapids, Inc. v. Chicago, Central & Pacific R. Co., 265 F. Supp. 2d 1005, 1012 (N.D. Iowa 2003) (definitions of "transportation" and "rail carrier"

8

"indicate that Congress intended for a broad grant of jurisdiction to the STB over railroad transportation and rail carriers.").

Section 10501 also provides that the STB's jurisdiction over rail operations is "exclusive" and "preempt[s] the remedies provided under Federal or State law." *Id*. The purpose of Section 10501 is to prevent a patchwork of local regulation from interfering with interstate commerce. *See* Petition of Norfolk Southern Railway Company for Declaratory Order, Docket No. FD 35701, 2013 WL 5891582 at *6 (S.T.B. November 4, 2013); H.R. Rep. No. 104-311, at 95-96 (1995)(noting the need for "uniformity" of federal standards for railroads and the risk of "balkanization" from state and local regulation).

Accordingly, state and local laws imposing noise, nuisance, land use, and zoning laws or regulations on railroads consistently have been found to be preempted because they necessarily interfere with railroad operations. *See*, *e.g.*, City of Auburn, 154 F.3d at 1031 (ICCTA held to preempt state and local environmental laws); South Dakota ex rel. S.D. R.R. Auth. v. Burlington N. & Santa Fe Ry. Co., 280 F. Supp. 2d 919 (D.S.D. 2003) (ICCTA held to preempt state law claims for punitive damages and tortious interference); Burlington N. Santa Fe Ry. Corp. v. Anderson, 959 F. Supp. 1288, 1296 (D. Mont. 1997) (ICCTA held to preempt state closure authority)*; see also* R.R. Ventures v. Surface Transp. Bd., 299 F.3d 523 (6th Cir. 2002); CSX Transp., Inc. v. City of Plymouth, 92 F. Supp. 2d 643, 656 (E.D. Mich. 2000); Village of Ridgefield Park v. N.Y., Susquehanna & W. Ry., 750 A.2d 57 (N.J. 2000).

The ICCTA also has been found to expressly preempt common law damage actions, such as tort claims, which are recognized as "state regulation" that would "…interfere with 'rail transportation' or 'operation' of railroad tracks or facilities." Benson v. Union Pac. R.R. Co., 2008 WL 2946331, at *3 (E.D. Cal. July 25, 2008)(citations omitted); Cipollone v. Liggett Grp., Inc., 505 U.S. 504, 521-22 (1992); Pejepscot Indus. Park, Inc. v. Maine Cent. R.R. Co., 297 F.

Supp. 2d 326, 333 (D. Me. 2003) ("[A]wards of damages pursuant to state tort claims may qualify as state 'regulation' when applied to restrict or burden a rail carrier's operations" and, thus, may be preempted).

With regard to the present matter, federal courts and the STB have repeatedly concluded that state or local laws governing the manner by which railroads may park or idle their locomotives are preempted by ICCTA. They have routinely found that the operation and/or idling of locomotives falls squarely within the parameters of rail operations over which the ICCTA preempts state remedies and/or statutory interference. *See* Petition of Norfolk Southern Railway Co. for Expedited Declaratory Order, Docket No. FD 35949, 2016 WL 750944 at *5 (S.T.B. February 22, 2016)(state statute restricting idling to certain times of day was federally preempted as practice of idling locomotives is "critical to day-to-day operations" of railroad); Petition of United States Environmental Protection Agency for Declaratory Order, Docket No. FD 35803, 2014 WL 7392860 (S.T.B. December 29, 2014)(California air quality management rules regulating idling of locomotives preempted by §10501(b) and in conflict with EPA regulations); Association of American Railroads v. South Coast Air Quality Management District, 622 F.3d 1094, 1097 (9th Cir. 2010)(cannot harmonize air quality management rules regulating idling of locomotives with ICCTA as they may "unreasonably burden railroad activity"); Middlesex County Health Department v. Consolidated Rail Corporation, 2009 WL 62444 (D. N.J. 2009)( preemption of state regulation where "railcars, fumes they emit while idling and tracks they travel" are all areas "under the umbrella of federal regulatory authority").

Recently, the Alabama Supreme Court determined in a similar case involving idling trains that the plaintiff's state law nuisance claims were preempted by the ICCTA. Norfolk Southern Railway Company v. Goldthwaite, 176 So. 3d 1209 (Ala. 2015). Plaintiff complained that the railroad used one of the tracks near his home as a temporary staging area for coal trains

10

with diesel locomotive engines running, from which he claimed personal injury and property damage caused by the "noise and noxious fumes." Id. at 1210. The railroad presented evidence that the restriction of its ability to store or idle trains on tracks of its choosing would "disrupt Norfolk Southern's operations and the transportation services it provides to a number of customers." Id. at 1211. The railroad also presented evidence that if the locomotives were shut down, the FRA-required air brake tests that would have to be completed on the train would interfere with its provision of rail transportation services to its customers. Id. at 1212. The Court determined that the plaintiff's claims were preempted, and wrote:

> The preemptive power, pursuant to the ICCTA, over rail transportation includes *regulatory power over movement of property by rail and storage of property*. Goldthwaite's action seeks to use Alabama nuisance law to regulate Norfolk Southern's operation of the railroad tracks, i.e., for the movement of property and its storage. Congress expressly provided that such matters, however, *are within the exclusive jurisdiction of the Surface Transportation Board*.

Id. at 1214 (emphasis added).

In another analogous case, Norfolk Southern Railway Company Petition for Declaratory Order, Docket No. FD 35701, 2013 WL 5891582 (S.T.B. November 4, 2013), the railroad sought a declaratory order finding that claims asserted in state tort lawsuits were preempted. Plaintiffs in those suits alleged property damage as a result of dust, vibration and noise generated by trains operating on the railroad's adjacent rail line. The STB found it to be undisputed that: (i) the railroad was a rail carrier; (ii) the activity that plaintiffs alleged was damaging their property – operating freight trains over the rail line near plaintiff's property – constituted "transportation by rail carrier" within the STB's exclusive jurisdiction; and (iii) the harms alleged by the plaintiffs directly resulted from the railroad's rail operations. Id. at 4. The STB wrote:

> Subjecting NSR to claims based on *the alleged byproducts* (such as *noise, vibration, and various discharges*) *of conventional and routine rail operations* on the rail carrier's own property – which could be invoked by owners of property near operating rail lines anywhere – would unduly burden interstate commerce and significantly hinder NSR's ability to function as a rail carrier, *amounting to*

*impermissible state regulation of NSR's operations*. Accordingly, Owners' claims against NSR are preempted under 49 U.S.C. § 10501(b). Id. (emphasis added).

The STB cited Pace and a plethora of federal and state cases finding such tort and property claims preempted. *See*, *e.g.*, Maynard, 360 F. Supp. 2d at 842 (claims that rail cars blocked access to plaintiffs' property and side track allowed drainage from other properties to run off onto plaintiffs' property are preempted); Rushing v. Kansas City S. Ry. Co., 194 F. Supp. 2d 493, 500-01 (S.D. Miss. 2001) (nuisance claim against a railroad for noise and vibration is preempted); Guckenberg v. Wis. Cent. Ltd., 178 F. Supp. 2d 954, 958 (E.D. Wis. 2001) (nuisance claim alleging that noise and smoke from rail cars unreasonably interfered with use and enjoyment of plaintiff's' property is preempted); Village of Ridgefield Park v. N.Y., Susquehanna & W. Ry., 750 A.2d 57, 67 (N.J. 2000) (state common law nuisance claims concerning noise and air pollution from railroad operations preempted).

These cases recognize that "awards of damages pursuant to state tort claims may qualify as state 'regulation' when applied to restrict or burden a rail carrier's operations." Pejepscot, 297 F. Supp. 2d at 333 (dismissing claim for tortious interference); Cipollone, 505 U.S. at 521 (obligation to pay award of damages is "designed to be…a potent method of governing conduct and controlling policy); In re Katrina Canal Breaches Consolidated Litigation, 2009 WL 224072 (E.D. La. 2009) (in finding ICCTA preemption of common law claims for damages, court finds application of state law negligence principles qualifies as an attempt at state law "regulation" in respect to rail transportation).

Courts have adopted an expansive interpretation of when idling locomotives are related to rail operations. For example, in Jones v. Union Pacific R.R. Co., 94 Cal. Rptr. 2d 661, 665 (Cal. Ct. App. 2000), the court noted that preemption is inapplicable only where the railroad's "activity in question did not further rail operations or was committed solely to harass plaintiffs." In the case at hand, there is no evidence that CSXT parked or idled its trains solely to harass or

disturb Plaintiffs or others who resided in surrounding areas. The evidence shows that CSXT's locomotives are idled for a variety of reasons that further safe and efficient rail operations, including, but not limited to, responding to scarce rail capacity, maintaining a properly functioning braking system, and preventing damage to the locomotive engines in cold weather.

The undisputed evidence in this case compels the conclusion that the idling of locomotives behind Plaintiffs' home was "necessary to reduce congestion and to operate [CSXT]'s railroad business safely and efficiently," thereby preempting Plaintiffs' claim under the ICCTA. (SOF at ¶¶ 9-39).; Jones, 94 Cal. Rptr. 2d at 665. Such operations clearly fall within the definition of "day-to-day railway operations" that would preempt any tort claim seeking to interfere with those operations. Guckenberg, 178 F. Supp. 2d at 956, 958–59. Plaintiffs in this case seek to dictate through tort law claims the manner in which CSXT conducts rail operations – including the location and times for parking locomotives. The law is clear that summary judgment is appropriate on any of Plaintiffs' allegations with regard to damages resulting from exposure to the operation of idling trains, because those claims are preempted. CSXT must have the ability to park trains or idle locomotives at locations it deems appropriate throughout its interstate rail system, in order to safely and efficiently provide rail service. (SOF at ¶¶ 9-32). Plaintiffs have not produced any evidence to the contrary, and CSXT therefore is entitled to summary judgment on all claims with regard to idling trains.

## II. PLAINTIFFS' ALLEGED DAMAGES WERE NOT PROXIMATELY CAUSED BY THE DERAILMENT

Plaintiffs also assert negligence against CSXT in Count I of the Complaint for damages allegedly suffered from the September 2, 2012 derailment. Count II – for "Intentional Conduct – Property Damage" – appears on its face to relate only to alleged damages caused by the parking or idling of locomotives, *not* to any derailment damages. Plaintiffs do not allege in their Complaint that the derailment caused any damage separate and apart from the damage allegedly

13

caused by the preempted locomotive idling. Moreover, the record is bereft of any evidence that the "damage" to Plaintiffs' property or health arose from or was contributed to by the derailment itself.

Everything in the Complaint is driven by the underlying assertion that Plaintiffs were damaged by the long-term effects of trains idling behind their home. (SOF at ¶ 53). Nowhere in the Complaint do Plaintiffs claim that they were damaged directly and independently by the September 2012 derailment. Nevertheless, any allegation that the derailment itself proximately caused damage to Plaintiffs is completely unsupported in the record. The undisputed evidence establishes that all of the property damage that Plaintiffs now claim came from the derailment was in fact the damage they were specifically complaining to CSXT about years before the derailment. (SOF at ¶¶ 54-71). Plaintiffs not only complained about the same damages to their property and the contents of their home, but also submitted exactly the same contractor proposals before and after the derailment. (SOF at ¶¶ 65-67, 69-71).

The same is true of the supposed personal injuries to Plaintiffs. Nowhere in the Complaint do Plaintiffs allege that they suffered personal or health injuries as a result of the derailment – the alleged health problems (according to the Complaint) arose solely from the parking and idling of locomotives. (Complaint, Docket No. 1, ¶¶ 9, 11). The undisputed facts in the record demonstrate that the injuries Mrs. Smith complained of to CSXT prior to the derailment were caused by the noise and vibration from the idling trains. (SOF at ¶¶ 54, 57). Plaintiffs' allegations of damage to their property and to their health from the derailment are all expressly tied to the supposed effect of the vibrations from idling locomotives – which are preempted and cannot be the basis of a state tort claim.[1]

---

[1] Even if claims related to idling of locomotives were not preempted, Plaintiffs have not presented any evidence that those alleged injuries or damages were in fact caused or contributed to by the idling of locomotives.

14

Rule 56(e) requires the nonmoving party to set forth "specific facts" that show there is an issue for trial. "Conclusory allegations, unsupported by specific facts, will not suffice." Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Payne v. Pauley, 337 F.3d 767, 772 (7th Cir. 2003) (citing Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990)). Plaintiffs have presented no evidence in this case - nor have they even alleged in their Complaint - that the derailment proximately caused any damage separate and apart from the supposed damages caused by the idling of locomotives. No valid evidence exists in the record to support the suggestion that "impact forces" from the derailment caused or contributed to any of the damages alleged. In fact, the record proves that virtually all of the damages Plaintiffs now attribute to the derailment are documented to have existed at least a year before the derailment. (SOF at ¶¶ 54-71). Plaintiffs cannot dispute this evidence. Moreover, there is no admissible evidence in the record to support the argument that the derailment in any way exacerbated any pre-existing damage to the property or to Plaintiffs' health. Therefore, summary judgment is proper on all claims of damage contained in Counts I and II with regard to the derailment.

## CONCLUSION

For the foregoing reasons, CSXT requests the entry of an order granting summary judgment in favor of CSXT on all claims contained in Plaintiffs' Complaint.

Respectfully submitted,

CSX TRANSPORTATION, INC.

By: /s/ Kathryn M. Doi #6274825
KATHRYN M. DOI
One of Its Attorneys

Sean M. Sullivan
Kathryn M. Doi
DALEY MOHAN GROBLE, P.C.
55 W. Monroe Street, Suite 1600
Chicago, IL 60603
(312) 422-9999